Dan R. Hanna, Jr., D. R. Hanna, Jr., Lucia Otis Hanna v. Commissioner.
Hanna v. Commissioner
Docket Nos. 25706, 25707.
United States Tax Court
1951 Tax Ct. Memo LEXIS 206; 10 T.C.M. (CCH) 566; T.C.M. (RIA) 51180; June 6, 1951
*206 Richard R. Hollington, Esq., 700 Union Commerce Bldg., Cleveland, Ohio, for the petitioners. Norment Custis, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: In these consolidated proceedings respondent determined a deficiency in income tax of $3,868.51 for the year 1944 against D. R. Hanna, Jr. and Lucia Otis Hanna, jointly, and a deficiency of $9,063.19 for the year 1946 against Dan R. Hanna, Jr., individually. The controversy stems from respondent's finding of additional income and disallowance of claimed deductions in the following items and amounts: 1944
Business Entertainment and Clubs
$ 447.74
Sales Tax
250.00
Rental Income (not in controversy)
183.67
Farm Loss
4,881.91
Kirby Bad Debt
11,615.58
1946
Additional Income (not in contro-
versy)
950.00
Contributions
500.00
Business Travel
1,030.00
Business Entertainment
750.00
Business Telephone
1,140.62
Business Club Dues
66.00
Payments on Bradley Note
454.83
Kirby Bad Debt
5,587.85
Farm Loss
3,267.81
Sales Tax
250.00
For convenience findings of fact and opinion will be made on each issue separately. General Findings *207 of Fact D. R. Hanna, Jr. and Dan R. Hanna, Jr. are one and the same person who resides on a farm on the outskirts of Cleveland, Ohio, with his wife, Lucia Otis Hanna. Dan and Lucia filed a joint income tax return for 1944 and Dan filed a separate return for the year 1946 with the collector of internal revenue for the 18th district of Ohio. Lucia is a joint petitioner with Dan in Docket No. 25707 which involves the year 1944. Issue 1 - Farm Findings of Fact In 1932 Dan rented the dwellings on Cottage Hill Farm II as a place to live. The house was partially furnished and he paid rent for it of from $150 to $300 a month. The farm on which the dwelling was located contained about 70 acres, including three to four hundred apple trees, a like number of peach trees as well as a tenant house, a barn, and several other farm buildings. In 1935 the owner of the farm was in distress. During Dan's tenancy there had been several good fruit years. He had the houses appraised and with the thought in mind that the place could be expanded into a profitable fruit farm and also serve as a residence he purchased it in 1935 for $37,500. Shortly thereafter Dan purchased a truck, spraying *208 equipment, and other tools for maintenance of the farm. A profit sharing arrangement was entered into with Sam Schupp, the former caretaker of the farm, for carrying on the fruit farming operation. Peach trees start to bear a little the third year and increase year by year. Apple trees take from six to seven years before they yield. A bad freeze killed off an entire peach orchard during the first year. This orchard was replaced with six or seven hundred trees and fruit farming continued to be a major farm activity until about 1940. By that time, after some further research into fruit farming and discussions with several friends with fruit farm experience, Dan became convinced that the weather hazards to fruit were too great at his location and decided to convert to raising grain and grazing cattle as soon as economically and physically possible. He so far had had no financially successful year with the farm. In the meantime Dan had remodeled the interior of the house and improved the other farm buildings. At the time he purchased the farm the barn which had a hardwood floor in the loft, also had a bandstand there. The bandstand was immediately removed to make the building more *209 suitable for farm purposes. An additional ranch house was built on the farm at a cost of something over $16,000 to serve as a home for Dan's children and those of his wife. In 1940 and thereafter Dan turned from fruit farming to raising grain crops and began to build up a herd of cattle and steers. Pasture land was fenced in and an adjoining 15 acres leased in order to grow grain for feeding purposes. Full conversion to grain and cattle farming went forward with reasonable speed. The process was delayed by the war when it became difficult to obtain necessary power equipment. A full time general farmer was hired in 1943. The conversion was still going forward in 1944 when a complete orchard was torn out. This operation continued until all fruit trees on the farm were uprooted in 1946. In 1944 Dan was farming approximately 85 acres of land, including 15 acres leased from a neighbor. He still had one orchard on the farm which was being operated on a share basis by Sam Schupp. He was growing 20 to 30 acres of corn, hay and oats, had two or three dairy cattle, was feeding six steers, had 80 to 100 chickens, and four work horses. In addition, Dan had a considerable amount of machinery *210 and equipment on the farm. In 1944 most of this machinery was horse drawn. By 1946 Dan had disposed of most of the horse drawn equipment and had replaced it with power driven machinery. He also had leased additional land which he devoted to oats, corn and hay. At that time he was farming 115 to 120 acres and the last of the fruit trees were removed as soon as the harvest was made for the year. The number of steers, cows, and chickens were the same as in 1944 and he also had some pigs on the farm in 1946. Dan always maintained a book in his office at the farm wherein he recorded all income received at the farm from such sources as the sale of eggs, sale of milk, sale of beef cattle, etc. This book is annually taken to his downtown office where the entries thereon are transferred to the Cottage Hill Farm pages of his general ledgers. All farm expenses are paid by check and they are then automatically entered on the Cottage Hill Farm pages of the general ledger. The aforementioned general ledgers accurately show income of $1,746.67, expenses of $6,628.58, and a loss of $4,881.91 for Cottage Hill Farm in 1944. For 1946 the general ledgers accurately show income of $2,243.50, expenses *211 of $5,511.31, and a loss of $3,267.81 for Cottage Hill Farm. Starting in 1946, with the acquisition of power machinery, Dan has been able to accelerate his policy of improvement and expansion to a substantial degree. He has increased acreage, purchased additional equipment, increased the amount of livestock, and has also done considerable custom farming and growing of certified seeds. Present indications are that the farm will show a profit in 1950. In 1944, 1945, and 1946, Dan employed a cook, a nurse, and a general handyman for his farm home. Other labor was hired by petitioner to take care of the farming operations. None of the farm labor assisted in maintaining the dwelling house, cottage, or the surrounding property. Dan used his home for entertaining in about the same manner as anyone of similar financial circumstances living in a suburban Cleveland home would do. He entertained friends and business acquaintances at his home in connection with his business as a newspaper publisher. He also entertained newsprint manufacturers, salesmen, and prospective tenants for the Hanna Building, and held corporation meetings there. Dan spent his business day at his offices in the Cleveland *212 News Building, the Hanna Building, the American Utilities Company, or at his farm. When he was on the farm he spent some of his time supervising the work and occasionally doing some of the necessary work during busy seasons. During the summer months he spent Saturday, Sunday, and one day each week on the farm. Dan made frequent Government reports covering statistics on cattle and grain yield. He filed regular forms covering the operation of the farm, showing the acreage of certain grain crops and received some income from the Government for liming practices. During the taxable years 1944 and 1946, Dan was operating Cottage Hill Farm II for the production of income. Issue 1 Opinion The nub of this issue is whether or not petitioner during the taxable years was operating Cottage Hill Farm II with a profit motive rather than as a recreation, a hobby, or primarily as a residential property. Respondent argues that the farm was not purchased with the intention of engaging in the business of farming, that there were consistent losses in its operation, and, further, that petitioner had no farming plan pursuant to which he could make profits. It is true that petitioner was first *213 attracted to the farm because it contained a dwelling which he leased as a desirable residence. A few years later, however, when petitioner made up his mind to purchase the place, his testimony is that he gave careful consideration to whether or not the farm could be operated at a profit, and we think he was motivated in the purchase by the hope of profit as much as by the prospect of obtaining a desirable home. Later, as the farming project got under way, petitioner's books were kept in a way that carefully segregated the farm expenses and income from those of the residence. The hired help was separate too. Petitioner did live in the house located on the farm, improved it, and made use of it in entertaining business friends, but we know of no reason why that should turn his farming venture into a non-business venture. That petitioner was seeking to make the farm profitable is shown by the course he pursued in changing from fruit farming to grain and cattle. This change was made after a series of loss years with the fruit during a period when the orchards should have been producing, if they were ever to produce. We think petitioner was earnestly seeking to make money out of his farm *214 and that is what motivated the change. Of course, he did not concentrate all of his attention or bend all of his effort in the direction of farming. He had numerous other interests which also made demands on his time. Nevertheless, petitioner made a reasonable effort to run the farm on a business basis, and we do not think this is a case where the personal motive of obtaining a residence outweighed the business motive of trying to develop a profitable farm. We find nothing in the record to indicate that petitioner was conducting his farming simply as a recreation or hobby. It was an expanding operation with him. He changed his plans as it became evident that his fruit farming was too hazardous for profits. This change could not be accomplished overnight because of the character of his first venture - it is a time consuming operation to change from fruit to grain - and we conclude that petitioner's conduct over the years was taken with profits in mind. Accordingly, the respondent should have allowed the farm losses of $4,881.91 for 1944 and $3,267.81 for 1946, as deductions. Issue 2 - Business, Travel, Entertainment, and Club Expense Findings of Fact During a period of years *215 long prior to and including the taxable years 1944 and 1946, Dan was regularly engaged in the business of investing in, promoting, financing through loans, and actively serving as an officer and/or director of a number of corporate enterprises, usually closely held companies which appeared to offer an opportunity for profitable operation. In connection therewith it was ordinary and necessary that he expend amounts for entertainment, travel, and other expenses in connection therewith. He was not reimbursed for such expenditures. On his joint income tax return for 1944, he took a deduction of $1,015 for "Business Entertainment & Clubs" of which respondent disallowed $447.74. Dan testified that in 1944 his club bills amounted to $2,138.65; that his bill at Monaco's Restaurant was $229.53, that his bills at the Ad Club and City Club totaled $72.50, and that he spent at least $1,015 for purely business entertainment. On his individual return for 1946, Dan took a deduction of $1,030 for "Business Travel" which was disallowed in full by respondent. This amount was spent for travel and travel expenses in connection with petitioner's business on trips made to New York and Fort Myers, Florida. *216 In 1946 petitioner was confined to his home by illness for about six months. He paid telephone bills charged to his home phone during that year amounting to $1,296.98. Of this amount he deducted $1,140.62 for "Business Telephone". During the time he was confined by illness he used his home phone for business purposes and expended the amount deducted in making calls in connection with the various enterprises in which he was interested. In 1946 Dan paid dues to the Cleveland Ad Club amounting to $66. Membership in this club was a business proposition for petitioner and was used in connection with his being an officer of the Forest City Publishing Company. Issue 2 Opinion For the year 1944 the issue is the propriety of respondent's disallowance of $447.74 of a claimed deduction of $1,015 for "Business Entertainment & Clubs". The evidence on this issue is too general to justify us in disapproving respondent's action, and we hold that the disallowance was proper. For the year 1946 our findings of fact are dispositive of the issues. The amounts deducted by the petitioner of $1,030 for business travel, $1,140.62 for business telephone, and $66 for business club dues should have *217 been allowed. Issue 3 - Sales Tax Findings of Fact On each of his returns for 1944 and 1946, petitioner took a deduction of $500 for sales tax. The retail sales tax in Ohio is three per cent on all purchases over 40". Respondent disallowed $250 of the claimed deduction in each year. Issue 3 Opinion Here again the evidence in substantiation of the claimed deductions is of a rather general nature. The difficulty a petitioner has in proving payment of taxes of this character is appreciated, but here there was simply the production at the hearing of canceled checks, without introduction in evidence, in the amount of $7,000 made out to retail stores in Ohio during 1944 and canceled checks in the further amount of $7,000 made payable to currency which the petitioner testified that he cashed and then expended the cash for items which were subject to the sales tax. We do not think this testimony overcomes the presumption that the respondent's disallowance of $250 for 1944 of the amount claimed for sales tax was correct. For the year 1946 the record is devoid of evidence, and the respondent's disallowance of $250 is also sustained. Issue 4 - Contributions for 1946 Findings *218 of Fact Petitioner took a deduction of $1,030 for contributions on his 1946 return. Of this amount $500 represented an item for contributions to churches. This respondent disallowed. Petitioner contributed $500 to churches in 1946. Issue 4 Opinion Petitioner testified that he had made substantial cash contributions in 1946 to the North Church building fund and that in addition he made cash gifts to other churches in Cleveland as well as the weekly offering of other family members. While the record contains no other evidence of these contributions beyond petitioner's oral testimony, we are satisfied as to the truth of the oral statements made on the witness stand in this respect and conclude that respondent should have allowed the $500 claimed as a church contribution. Issue 5 - Bad Debt (Bradle Note) Findings of Fact About 1929 petitioner was an officer and stockholder of the Postergraph Company which occupied space in the Bradley Building in Cleveland, Ohio. The Company desired to moved to a new location but, being in arrears in rent, was not able to move its machinery unless some of the major stockholders would guarantee the arrears in rent. Petitioner and other stockholders *219 undertook the guarantee. The Company was subsequently liquidated and in settlement of his liability as guarantor petitioner executed a note payable to the Bradley Company. As payments of interest and principal have been made over the years on this obligation the note outstanding at the time of payment has been canceled and a new note executed in its place. In 1946 petitioner made payments of $454.83 on the principal of the note then outstanding and deducted that amount as a business expense. Respondent disallowed the deduction. Issue 5 Opinion Respondent concedes the law on this issue to be with petitioner. See Abraham Greenspon, 8 T.C. 431 [Dec. 15,632]. We think the evidence fully substantiates petitioner's deduction and it should have been allowed. Issue 6 - Bad Debt (Kirby Notes) Findings of Fact In connection with his above-mentioned business of investing in, promoting and financing numerous corporations prior to and during the taxable years, Dan entered into business transactions with Josiah Kirby & Company, Inc., (hereinafter referred to as Kirby Co.) which was managed by josiah Kirby and which was also engaged, inter alia, in investing in, promoting *220 and financing corporations. Beginning in about 1932 and continuing until 1941 Dan entered into a series of separate agreements with Kirby Co. for each of various transactions, some of which involved investments in stock and some of which involved loans to that company for use in its promoting and/or financing enterprises. Some of Dan's loans were collaterally secured by shares of stock and some were carried on his books as an open account receivable. The loans were repayable in a specified time with 6 per cent interest and usually in addition thereto Kirby Co. agreed to pay Dan 50 per cent of any profit realized on the particular promoting or financing enterprise. During December 1938 and March and June 1939 Dan made business loans in certain amounts to Kirby Co. At about the same time Lucia, acting through Dan as her agent, made loans of her individual funds to Kirby Co. under agreements similar to those Dan entered into on his own behalf. Those loans were not repaid in full up to and including 1943. During 1943 Dan had some misgivings as to the financial stability of Kirby Co. and pressed for settlement of amounts due him and Lucia. On account of those unrepaid loans and in the *221 principal amount of the then acknowledged indebtedness of Kirby Co. to Dan and Lucia, respectively, two interest bearing demand notes were executed jointly by Kirby Co. and Josiah Kirby and were delivered to Dan and Lucia. One note, dated August 17, 1943, was made payable to Dan R. Hanna, Jr. in the principal amount of $14,175.71, and the other note was made payable to Lucia Otis Hanna in the principal amount of $5,958.08. During 1944 those notes remained unpaid, suits were brought thereon, judgments were obtained simultaneously in Cleveland and New York, and executions issued uncovered only about $4,500 in cash assets. It being impossible to collect the full amount of the judgments the best obtainable compromise settlements thereon were entered into in 1944. In full settlement of his judgment on the $14,175.71 note Dan received, in 1944, $1,500 cash and Kirby Co.'s promissory note in the principal amount of $5,587.85 payable in 18 months. In full settlement of her judgment on the $5,958.08 note Lucia received a cash settlement in the net amount of $2,561.65. The indebtednesses represented by the balance of those judgments became worthless in 1944 and the resulting bad debts were *222 a business bad debt in the amount of $7,087.86 as to Dan, and a nonbusiness bad debt in the amount of $3,396.43 as to Lucia. During 1945 and 1946 Dan's legal counsel made continuous efforts to collect on the 1944 promissory note for $5,587.85 without success and in 1946 he advised Dan that the debt represented thereby had become worthless. On the joint return of Dan and Lucia for 1944, they claimed a deduction of $11,615.58 as a bad debt loss on the Kirby Co. notes and respondent disallowed that deduction in full. On his separate return for 1946, Dan claimed a deduction of $5,587.85 as a bad debt loss on the Kirby Co. note and respondent disallowed that deduction in full. Issue 6 Opinion Under the facts herein it is clear that petitioner Dan is entitled to a business bad debt deduction in the amount of $7,087.86 for the year 1944, pursuant to section 23(k) (1), Internal Revenue Code. Vincent C. Campbell, 11 T.C. 510. Cf Henry E. Sage, 15 T.C. 299. It is equally clear that as to petitioner Lucia a nonbusiness debt became worthless in the amount of $3,396.43 in 1944 and that under section 23(k)(4), "the loss resulting therefrom shall be considered *223 a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months". For the year 1944 respondent erred in failing to allow petitioners the deductions as above indicated. For the taxable year 1946 there is no proof that the $5,587.85 promissory note received by Dan in 1944 actually became worthless in 1946 and therein petitioner has failed to meet his burden of proof. For the year 1946 respondent's determination on the Kirby notes issue, is sustained. Decision will be entered under Rule 50.